# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

|                                   |     |                  |
| --------------------------------- | --- | ---------------- |
| UNITED STATES OF AMERICA,         | )   |                  |
|                                   | )   |                  |
| Plaintiff,                        | )   |                  |
|                                   | )   |                  |
| vs.                               | )   | No. CR 12-0587 RB |
|                                   | )   |                  |
| ARMANDO SAUZAMEDA-MENDOZA,        | )   |                  |
|                                   | )   |                  |
| Defendant.                        | )   |                  |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant's Motion to Suppress Evidence and

Statements and Supporting Memorandum, filed May 1, 2012. (Doc. 35). Having carefully

considered the submissions of counsel, relevant case law, evidence adduced at the July 11, 2012

hearing, and being otherwise fully advised, the Court **DENIES** Defendant's motion.

## FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved

in deciding a motion, the Court must state its essential findings on the record. The Court

therefore makes the following factual findings based on the testimony offered at the evidentiary

hearing held on July 11, 2012, and the exhibits presented, including the DVD video recording of

the traffic stop and the audio recording taken from the microphone attached to Officer Alvarez's

person.

1.      Officer Christopher Alvarez ("Officer Alvarez") is a K-9 officer with the New Mexico

        Department of Public Safety, Motor Transportation Police. He has been an employee of

this division for five years and has nine total years of law enforcement experience.

2.     On November 5, 2011, Officer Alvarez was on patrol in Hidalgo County, New Mexico. At approximately 9:41 a.m.[1], as he turned from Interstate 10 East (I-10E) onto Highway 80 South (Hwy 80), he observed a red 1998 Dodge 3500 pickup truck bearing Arizona license plate CF85243 traveling northbound on Hwy 80, pulling a boat and appearing to travel faster than the posted speed limit.

3.     The truck then pulled onto Interstate 10 traveling westbound.

4.     Officer Alvarez turned around and proceeded to follow the truck. Both visually and through use of radar, Officer Alvarez confirmed the speed of the truck at 50 miles-per-hour in a 45 mile-per-hour zone. He further observed that the trailer hauling the boat did not carry a license plate, in violation of New Mexico statutory law.[2] Based on these observations, Officer Alvarez decided to initiate a traffic stop.

5.     Officer Alvarez initiated the stop on I-10 westbound near milepost 4, a location less than

---

[1] At the evidentiary hearing, Officer Alvarez explained that the time stamp located on the lower right-hand side of the DVD video captured by his dashboard camera is approximately one hour behind the actual time. Therefore, while the video shows Officer Alvarez initiating the stop at approximately 8:41 a.m., the actual time was about one hour later, at 9:41 a.m. All time notations throughout this Order reflect the actual time – one hour past the DVD time stamp – except where otherwise indicated.

[2] The Government cites 1978 NMSA § 66-3-18(B) as the provision Defendant violated by not carrying a license plate on the trailer. Section 66-3-18(B), however, pertains to the display of demonstration or temporary registration permits. Given Officer Alvarez's testimony that he stopped the truck in part because the trailer hauling the boat did not carry a license plate, it is unclear how this subsection applies to the facts at hand. It is possible that the Government intended to cite § 66-3-18(A), which provides that registration plates must be attached to the rear of the vehicle for which they are issued. Regardless, the Court accepts Officer Alverez's testimony that the trailer hauling the boat did not have a license plate in violation of New Mexico statutory law.

100 miles from the United States border with Mexico.

6.      Officer Alvarez testified credibly regarding the circumstances of the stop.

7.      At approximately 9:42 a.m., Officer Alvarez approached the vehicle from the passenger side and introduced himself to the driver, Roberto Alcuras.   Defendant Armando Sauzemeda-Mendoza, the registered owner of the truck and Mr. Alcuras's cousin, was the sole passenger.

8.      Officer Alvarez identified Defendant Sauzameda-Mendoza as the passenger of the truck.

9.      Officer Alvarez explained that he initiated the stop because the boat trailer did not have a license plate.  In response, Defendant Sauzameda-Mendoza stated that the boat trailer did not need a license plate, and exited the truck to show Officer Alvarez a sticker on the boat.  Officer Alvarez advised Defendant that he still needed a license plate for the trailer, and asked Defendant for the trailer's paperwork.

10.    Officer Alvarez asked the driver, Mr. Alcuras, for his driver's license and to accompany him to the right-front bumper area of his unit where he generally conducted business. Mr. Alcuras complied.   While issuing citations, Officer Alvarez began to ask Mr. Alcuras about the men's travel plans.

11.    Mr. Alcuras old Officer Alvarez that he was from Kansas, had been on vacation in Douglas, Arizona (a U.S./Mexico border town), and was traveling to Benson, Arizona to drop off the boat with a friend of Defendant Sauzemeda-Mendoza.   When Officer Alvarez asked for the name of the person with whom they intended to drop off the boat, Mr. Alcuras stated that did not know the friend's name.

12.    At approximately 9:45 a.m., Officer Alvarez informed Mr. Alcuras that he had also

observed the truck traveling at 50 miles-per-hour in a 45 mile-per-hour zone.

13.     At approximately 9:47 a.m., Officer Alvarez re-approached the truck to ask Defendant

Sauzemeda-Mendoza for the truck registration and to verify that the Vehicle

Identification Number ("VIN") on the truck registration was the same as the VIN on the

vehicle. While doing so, Officer Alvarez asked Defendant questions about his travel

plans. Defendant likewise told Officer Alvarez that he was from Kansas, had been

working in the area, and was headed to Benson to drop off the boat with a friend. When

Officer Alvarez asked for the friend's name, Defendant first said that he was not sure,

and then said "Carlos, I think."  This raised Officer Alvarez's suspicions because neither

person knew the name of the person they were taking the boat to, despite stating that the

person was Defendant's friend.  Defendant also told Officer Alvarez that he and Mr.

Alcuras were cousins in response to Officer Alvarez's question about the nature of the

men's relationship to one another.

14.     At approximately 9:50 a.m., Officer Alvarez returned to his police unit in order to issue

the relevant citations.  At 9:51 a.m., ten minutes into the stop, he again asked Mr. Alcuras

where he was coming from and where he was going.  Mr. Alcuras again replied that he

was coming from Douglas and was on his way to Benson.  Officer Alvarez thought that

this travel route – northeast on Hwy. 80 to I-10 and then west to Benson – was suspicious

because it added approximately 100 miles (an over an hour of driving time) to the more

direct route of travel, northwest on Hwy. 80 to Benson.

15.     Furthermore, the men's chosen route was suspicious because it bypassed all Border

Patrol checkpoints and is a route frequently utilized by drug smugglers.  New Mexico

Hwy 80 originates in the border town of Douglas, Arizona, and then runs north through the sparsely populated "boot heal" of southwestern New Mexico. At its northern terminus, Hwy 80 connects with I-10, from which point it can be taken northwest to Tuscon and beyond, without ever having to pass through a Border Patrol checkpoint.

16.    Had the defendant taken the more direct route, northwest on Hwy 80, he would have encountered a Border Patrol Checkpoint between the towns of Tombstone and Benson, Arizona.

17.    Officer Alvarez testified that based on his own law enforcement experience, including his discussions with drug smugglers who have transported drugs from Douglas via Hwy 80E to I-10W, narcotics smugglers choose this route to avoid border patrol checkpoints. Officer Alvarez testified credibly regarding his knowledge and experience with this particular drug smuggling route.

18.    When Officer Alvarez asked Mr. Alcuras why he had taken this road to Benson, Mr. Alcuras explained that the two men were not from the area and had taken the wrong road. This also raised Officer Alverez's suspicions because Mr. Alcuras possessed an Arizona Driver's License bearing a Douglas, Arizona address, which had been issued on October 7, 2011.

19.    At approximately 9:52 a.m., Officer Alvarez again asked Mr. Alcuras if he knew the name of the friend they intended to drop the boat off with, to which he replied "honestly, I don't."

20.    Officer Alvarez spent the next several minutes completing the two traffic citations. At approximately 9:59 a.m., Officer Alvarez ended the traffic stop by explaining to Mr.

Alcuras his options with regard to the two citations, returning his driver's license and the truck and trailer registration, and giving him a warning citation for speeding and a traffic ticket for failure to have a license plate on the boat trailer. Officer Alvarez additionally told Mr. Alcuras to "have a safe trip." The entire traffic stop took approximately 18 minutes. As Mr. Alcuras walked back toward his vehicle, however, Officer Alvarez called out after him to see if he could ask a few more questions. Mr. Alcuras responded "yeah," turned around, and re-approached the police unit.

21.     Officer Alvarez then asked several additional questions regarding ownership of the boat and the men's course of travel.

22.     At approximately 10:01 a.m., Officer Alvarez asked Mr. Alcuras who the boat belonged to. Mr. Alcuras stated that the boat belonged to Defendant's friend, who had let them borrow it to go fishing, and that they had gone fishing the week before in San Carlos. At that point, Mr. Alcuras began to move in the direction of his vehicle. Officer Alvarez then asked Mr. Alcuras to "come here real quick." Mr. Alcuras complied.

23.     Officer Alvarez continued to ask questions about the boat. Mr. Alcuras explained that they had picked up the boat from "a friend of ours over there in Douglas," but did not know the exact address. He stated that they were taking the boat to Benson in order to drop it off either with the man from whom they had picked it up or "somebody that he knows."

24.     At approximately 10:03 a.m., Officer Alvarez again questioned Mr. Alcuras about his travel route. Mr. Alcuras stated that he was off-route because he "wasn't paying attention" and must have missed the road. He stated that he realized he was lost after

6

passing the New Mexico state line, and had looked up directions on his iPhone.  This also

aroused Officer Alvarez's suspicions because he was aware that the area close to the state

line had virtually no cellular phone reception.  When Officer Alvarez asked Mr. Alcuras

whether he had been able to get service in that area, Mr. Alcuras responded that he did

not have service in certain spots, but was able to get service further down the road.

25.     Suspecting that the men were involved in an illegal activity, Officer Alvarez asked Mr.

Alcuras if there were any illegal drugs in the truck or boat, including marijuana, cocaine,

methamphetamine, or heroin.  Mr. Alcuras said no.  Officer Alvarez then asked Mr.

Alcuras for consent to search.  Mr. Alcuras said "Yeah."

26.     At approximately 10:04 a.m., Officer Alvarez re-approached the truck and asked

Defendant Sauzameda-Mendoza if he could ask him some questions.  Defendant agreed.

Officer Alvarez asked Defendant additional questions regarding the men's travel plans.

Defendant again stated that they were coming from Douglas and on their way to Benson.

When Officer Alvarez asked the Defendant why they had taken this particular route to

Benson, Defendant replied that he thought this was the most direct route. This further

raised Officer Alvarez's suspicions because it contradicted Mr. Alcuras's statement that

the men had gotten lost.

27.     At approximately 10:06 a.m., Defendant stated that he had taken possession of the boat in

Mexico and had used it in Puerto Peñasco, Mexico. Officer Alvarez found this suspicious

because it contradicted Mr. Alcuras's story that they had picked up the boat "from a

friend of ours" in Douglas. Defendant explained that Mr. Alcuras was not with him in

Puerto Peñasco, and that Mr. Alcuras had joined him only a week or two before.

7

Defendant further stated that he had not taken the boat anywhere else,[3] contradicting Mr. Alcuras's statement that they had taken the boat the week before to go fishing in San Carlos.

28.     At approximately 10:07 a.m., Officer Alvarez asked Defendant if there were any illegal drugs in the truck or boat and Defendant said "no." Officer Alvarez then asked Defendant if he could search the truck and boat and Defendant asked "why?" Officer Alvarez answered "because I think you're hauling illegal drugs."

29.     Defendant told Officer Alvarez that he could not search the truck or boat. Officer Alvarez then informed Defendant that he was going to "run a narcotics detection canine" around the truck and boat and, depending on what happened, would determine whether to obtain a search warrant. Officer Alvarez then conducted a *Terry* patdown of Defendant and asked Defendant to stand by.

---

[3] At this point in the exchange, there is a conflict between the Court's own review of the DVD footage and the transcript provided by the Government. In the DVD recording of the traffic stop, at time-stamp 9:07:06, Officer Alvarez appears to ask the Defendant, "Have you took it [the boat] anywhere else?", to which Defendant replies "no, nowhere else." This interpretation of the footage comports with Officer Alvarez's testimony at the evidentiary hearing, in which he stated that he asked the Defendant whether he *had taken* the boat anywhere other than Puerto Peñasco. The transcript of the video provided by the Government, however, states that Officer Alvarez said "are you *taking* it anywhere else?", to which Defendant replied "no, nowhere else." The difference in phrasing has some import because Officer Alvarez testified that Defendant's response to this question conflicted with Mr. Alcuras's statement that the men had taken the boat to go fishing in San Carlos. Were the Court to accept the transcript's version of Officer Alvarez's question, Defendant's answer that they were not *going to take* the boat anywhere else is not inconsistent with Mr. Alcuras's statement that they *had taken* the boat to San Carlos. Defendant's response, then, would not be evidence supporting probable cause, as discussed in Section C *infra*. On balance, the Court finds that Officer Alvarez asked whether Defendant "took" the boat anywhere else, to which Defendant replied that he had not. It bears noting, however, that this particular exchange constituted only one factor supporting probable cause. The Court finds that probable cause would have existed regardless of Officer Alvarez's phrasing of this particular question.

8

30.    At approximately 10:09 a.m., Officer Alvarez re-approached his unit, where Mr. Alcuras remained standing, and asked Mr. Alcuras if he had any weapons on his person.  Mr. Alcuras replied "no."

31.    Officer Alvarez then stated, "I just want to clarify something up real quick, okay? Is that okay, if I ask you another couple questions?"  Mr. Alcuras stated "Yeah."  Officer Alvarez then asked Mr. Alcuras about the lakes he had visited with the boat.  Mr. Alcuras again stated that they had visited "San Carlos" "a couple weeks ago" as well as the week before – contradicting Defendant's statement that he had been to Puerto Peñasco with the boat and nowhere else.  Officer Alvarez also asked Mr. Alcuras whether he was "positive" that he had only been in Douglas for two or three weeks at the most, and when Mr. Alcuras responded affirmatively, Officer Alvarez asked why he had a driver's license with a Douglas, Arizona address which had been issued roughly four weeks prior to the stop.  Mr. Alcuras responded that he had a couple relatives in Sonora, Mexico, had been in Douglas four weeks before, and had left for a week before returning for three weeks.

32.    At approximately 10:10 a.m., Officer Alvarez conducted a *Terry* patdown of Mr. Alcuras and asked him to stand by while he retrieved his narcotics detection canine.

33.    Officer Alvarez has been a certified detection canine handler since September of 2008. He has worked with the narcotics detection canine "Bodo" for approximately two years and the two have been certified as a narcotics detection team on four separate occasions. Their most recent certification was issued in October of 2011 by the New Mexico Department of Public Safety, Criminal Enforcement Unit.

34.    From approximately 10:13 a.m. to 10:15 a.m., Officer Alvarez and his canine Bodo

9

walked around the truck and boat.

35.     Bodo "alerts" to the odor of contraband through sudden changes in body posture and

        increased respiration, and Bodo identifies the source of contraband by sitting down.

36.     Officer Alvarez and Bodo first completed a full pass around the truck and boat and next

        moved into a systematic search.

37.     During the systematic search, Bodo alerted to the rear of the boat by changing his

        breathing.  At 10:14:46 a.m.[4] in the DVD footage, Bodo can be seen moving his nose up

        and down in a pronounced fashion.  This behavior constituted an alert to the presence of

        contraband.

38.     At 10:15:02 a.m.[5], Bodo "indicated," or sat down, at the rear right panel of the truck.

        This behavior indicated that Bodo smelled contraband in the truck.

39.     Officer Alvarez testified credibly regarding the circumstances of the canine search.  Bodo

        alerted to the presence of contraband in the truck and boat.

40.     The canine search concluded at approximately 10:15 a.m.

41.     At approximately 10:16 a.m., Officer Alvarez explained to the Defendant that Bodo had

        alerted to both the truck and the boat, and that he was going to call the District Attorney's

        office to attempt to obtain a search warrant.

42.     At approximately 10:21 a.m., Officer Alvarez contacted Hidalgo County Assistant

        District Attorney Gerald Byers and detailed his probable cause for a search warrant.  Mr.

        Byers agreed there was enough information to obtain a search warrant.

_____

[4] Time-stamped 9:14:46 a.m.

[5] Time-stamped 9:15:02.a.m.

43.    At approximately 10:28 a.m., Officer Alvarez informed Defendant Sauzameda-Mendoza that he was in the process of calling a tow truck and that he had received approval from the District Attorney to get a search warrant for the truck.  Officer Alvarez then informed Defendant that another option would be to allow Officer Alvarez to search the vehicle on the spot.

44.    Defendant Sauzameda-Mendoza then asked Officer Alvarez how long the search process would take.  Officer Alvarez replied that it would take "as long as it takes," and that the tow truck was coming from Lordsburg, a town approximately 30 miles away.  Defendant responded, "search it I guess."  Officer Alvarez then said, "search it?", to which Defendant replied "yeah."

45.    Officer Alvarez presented both Mr. Alcuras and Defendant Sauzameda-Mendoza with Consent to Search forms.

46.    Officer Alvarez asked Defendant whether he understood Spanish or English better.  Defendant replied "both."  While reading the English-version Consent to Search form, Defendant asked Officer Alvarez whether he correctly understood the form to say that he had "the right to . . . . not give you consent?"  Officer Alvarez replied "yes."  Defendant then asked Officer Alvarez whether, if he did not give his consent, Officer Alvarez would proceed to secure a warrant.[6]  Officer Alvarez responded "yes."  Defendant did not ask any other questions regarding the Consent to Search form and appeared to understand the form.

_____

[6] This statement is inaudible in the DVD footage.  The Court is relying on Officer Alvarez's representation at the evidentiary hearing, which the Court finds to be credible.

11

47.     At approximately 10:34 a.m., Defendant signed the Consent to Search Form.  On the

form, the words "Red 98 Dodge, CF 85243/AZ," and "Wht Boat" are written into the

blank space where the property to be searched is identified.

48.     Officer Alvarez, along with another officer who had arrived at the scene, proceeded to

search the boat.  Upon removing several screws from the floor of the boat and prying

open the boards on the bed of the boat, Officer Alvarez identified a package wrapped in

brown tape, which was consistent with contraband.  Law enforcement officers ultimately

recovered numerous bundles of marijuana.[7]

49.     Both men were placed under arrest at approximately 10:55 a.m., roughly one hour and 13

minutes into the encounter.

50.     At all times during the encounter, Officer Alvarez was in uniform, carried weapons but

did not brandish or display them, made no threats, was not aggressive, and maintained a

conversational tone when speaking with Defendant.

51.     Defendant Sauzameda-Mendoza and Mr. Alcuras were then taken to Lordsburg, New

Mexico, where they met several Immigrations and Customs Enforcement ("ICE") Agents

at approximately 2:30 p.m.

52.     ICE Agents then transported the men to the ICE office in Deming, New Mexico.

53.     Once at the station, ICE Special Agent Rodrigo Prieto ("SA Prieto") met with Defendant

Sauzameda-Mendoza in order to read him his *Miranda* rights and to conduct a post-arrest

---

[7] Although the Government submitted photographs of the marijuana bundles into
evidence, and Defendant did not contest that these bundles contained marijuana, the Government
failed to elicit testimony or submit exhibits regarding the number of bundles found or the gross
weight of the contraband.

interview.

54.    SA Prieto identified Defendant Sauzameda-Mendoza as the individual he met and

interviewed in connection with this investigation on November 5, 2011.

55.    SA Prieto asked Defendant whether he preferred to communicate in English or Spanish.

Defendant responded that he preferred English.

56.    SA Prieto advised Defendant of his rights by reading the list of rights contained within

the Statement of Rights form, providing the form to Defendant to read himself, and

asking Defendant to write his initials next to each individual right upon reading and

understanding the form.

57.    The Statement of Rights form included the following statements: (1) you have the right to

remain silent; (2) anything you say can be used against you in court, or other

proceedings; (3) you have the right to consult an attorney before making any statement or

answering any questions; (4) you have the right to have an attorney present with you

during questioning; (5) if you cannot afford an attorney, one will be appointed for you

before any questioning, if you wish; and (6) if you decide to answer questions now, you

still have the right to stop the questioning at any time, or to stop the questioning for the

purpose of consulting an attorney.

58.    Defendant Sauzameda-Mendoza read the Statement of Rights form and initialed beside

each of the statements listed in ¶ 57.

59.    SA Prieto verbally advised Defendant Sauzameda-Mendoza of the waiver section of the

Statement of Rights form and then allowed Defendant to read the waiver section himself.

The waiver states: "I have had the above statement of my rights read and explained to me

and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity. I was taken into custody at 2:30p (time), on 11-5-11 (date), and have signed this document at 6:55 p.m. (time), on 11-5-11 (date)."

60.    Defendant Sauzameda-Mendoza read the waiver and printed and signed his name in the blank spaces provided.

61.    SA Prieto and another agent, SA Carlos Martos, witnessed the Defendant signing the waiver. Both agents signed and dated the waiver form in the spaces left blank for witness' signatures.

62.    SA Prieto and SA Martos interviewed Defendant Sauzameda-Mendoza for a period of a few minutes.[8] The interview took place in an ICE conference room containing a table and set of chairs. Both agents were dressed in plain clothes. Neither agent brandished nor displayed any weapon. The tone of the interview was conversational.

63.    Defendant Sauzameda-Mendoza never asked to terminate the interview. The interview concluded upon Agent Prieto (1) ensuring that Defendant had initialed and signed the Statement of Rights, (2) reviewing the questions he had asked Defendant, and (3) ensuring that he had recorded Defendant's answers accurately.

64.    Defendant never indicated that he did not understand his rights. Defendant did not express any reluctance in waiving his rights. Defendant never requested an attorney.

65.    On March 21, 2012, Defendant was indicted on one count of possession with intent to

---

[8] While the Court would have appreciated greater specificity regarding the amount of time the agents interviewed Defendant, SA Prieto testified that the interview took "a few minutes"; Defendant did not object or offer any alternative time frame.

distribute 50 kilograms and more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(C), and 18 U.S.C. § 2.


**CONCLUSIONS OF LAW**

1.    Defendant Sauzameda-Mendoza moves to suppress from use at trial "any evidence and

statements allegedly made by Defendant after his unlawful detention and interrogation,

. . . and any evidence obtained, directly or indirectly, as a result of any unlawfully

obtained statement and/or evidence."  Such evidence "includ[es] but [is] not limited to

following: the 164 pounds (74.5 kgs) of marijuana allegedly found in Defendant's

vehicle; his statements and verbal admissions; statements and verbal admissions of any

passengers; and other evidence derived from or located as a result of that search and

seizure." (Doc. 35 at 1).

2.    In support of his motion, Defendant Sauzameda-Mendoza contends that (1) the initial

stop was not supported by reasonable suspicion of criminal activity; (2) the scope of the

detention exceeded permissible bounds; (3) there was no reasonable suspicion of criminal

activity to support search of vehicle using a canine; and (4) Defendant did not initially

consent to the search of the vehicle, and any alleged subsequent consent was involuntary.

The United States responds that (1) Officer Alvarez's initial stop of Defendant's vehicle

was lawful; (2) Officer Alvarez issued the traffic citations in a reasonable period of time;

(3) continued detention was proper because Officer Alvarez had reasonable suspicion

that Defendant was engaged in illegal activity, and in any event, both men agreed to

speak with Officer Alvarez after the traffic stop, thus converting the stop into a

15

consensual encounter; (4) Defendant consented to search of the truck and boat; and (5) the inevitable discovery doctrine bars Defendant's motion. (Doc. 41 at 8).

3.   **Initial Detention**.  Defendant Sauzameda-Mendoza first contends that the scope of his initial detention exceeded permissible bounds under the strictures of *Terry v. Ohio* and violated his Fourth Amendment right to be free from unreasonable searches and seizures.

4.   The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. CONST. AMEND. IV; *United States v. Burleson*, 657 F.3d 1040, 1044-45 (10th Cir. 2011).  The protection afforded to citizens by the Fourth Amendment extends to investigatory detentions arising out of routine traffic stops.  *United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004); *Terry v. Ohio*, 392 U.S. 1 (1968). Courts analyze the constitutionality of traffic stops under the principles set forth in *Terry v. Ohio*, which provide that a stop must be both "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place."  *Burleson*, 657 F.3d at 1045, 1045 n.2.

5.   *The Stop was Justified at its Inception*.  A traffic stop is justified at its inception if an officer has either "(1) probable cause to believe a traffic violation has occurred, . . . or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' "*United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999) (internal citations omitted).   In this case, prior to initiating the stop, Officer Alvarez observed that (1) Defendant's vehicle was traveling five miles-per-hour above the posted speed limit, and (2) the trailer the Defendant was hauling did not have a license plate, in violation of New Mexico

16

statutory law.  Defendant has not contested either of these observations.

6.    The Court concludes that the stop was justified at its inception because Officer Alvarez credibly testified that Defendant was traveling in excess of the posted speed limit and hauling a boat on a trailer which did not carry the required license plate.  Accordingly, he had probable cause to initiate the traffic stop. *See United States v. Jackson*, 235 F. App'x 707, 710 (10th Cir. 2007) (finding probable cause to initiate a traffic stop existed where the officer "clocked the defendants' vehicle traveling seventy-nine miles per hour in a seventy-five mile-per-hour speed zone, a relatively minor violation of . . . the traffic laws, but a violation nonetheless.")

7.    *The Stop was Reasonably Related in Scope to the Circumstances which Justified the Interference in the First Place*.  Defendant next contends that Officer Alvarez's line of questioning prior to issuance of the traffic citations was unrelated to the purpose of the stop and therefore exceeded the allowable scope of the traffic stop.

8.    In determining whether the scope of a traffic stop was reasonably related to the circumstances which justified the stop in the first place, courts focus their inquiry on "the reasonableness of the traffic stop in light of both the length of the detention and the manner in which it was carried out."  *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011).  "In the context of routine traffic stops, a law enforcement officer may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate."  *Rosborough*, 366 F.3d at 1148. The Tenth Circuit has additionally held that during a lawful traffic stop, officers may ask routine questions regarding the driver's travel plans and vehicle ownership. *United States*

17

*v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006); *see also Williams,* 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.").  Finally, officers may ask questions outside the scope of the traffic stop so long as the questions do not "appreciably prolong the length of the stop." *Polly*, 630 F.3d at 997 (citing *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007)).

9.    Prior to issuing the citations, Officer Alvarez asked the Defendant where he was traveling, what he intended to do in Benson, with whom he intended to drop off the boat, how he came to southern Arizona from Kansas, where he was working, how long he had owned the truck, and how long he had been in the area.   Similarly, Officer Alvarez asked Mr. Alcuras where he was headed, why he was going to Benson, where he was from, what brought him to southern Arizona from Kansas, who he intended to drop the boat off with, what he had been doing in the area, why he was in southern Arizona on vacation, whether he intended to drop off the boat and head home, which town specifically he was coming from, why he had chosen to take this particular road to Benson, what his relationship was to Defendant Sauzameda-Mendoza, how long he had been on vacation in the area, and how long he intended to stay.

10.   The Court concludes that Officer Alvarez's questions were largely limited to the ownership of the vehicle and the men's travel plans, and were therefore within the scope of the traffic stop.  The only questions which could arguably be considered unrelated to the Defendant's travel plans or ownership of the vehicle – namely, the name of the person with whom the men intended to drop off the boat, where Defendant had been

working, and the relationship between the Defendant and Mr. Alcuras – did not appreciably prolong the length of the stop either individually or in the aggregate. *See Valenzuela*, 494 F.3d at 890. The stop took 18 minutes to complete, in which time Officer Alvarez (1) advised the men of the purpose of the stop, (2) obtained Mr. Alcuras's driver's license, (3) obtained the registration for the truck and trailer, (4) verified the VIN on Defendant's vehicle, (5) ascertained both men's names, (6) explained to Mr. Alcuras his options of pleading guilty or requesting a court date, and (7) wrote up two separate traffic citations. During this time, Officer Alvarez spoke with both men, separately, about their travel plans and about the truck and the boat, and acquired reasonable suspicion to detain them further as discussed *infra*. The Court concludes that under the circumstances, Officer Alvarez worked diligently to complete the traffic stop and that his questions did not extend the stop beyond the time reasonably required to issue the citations. Thus, the initial stop was reasonable. *See United States v. Briseno*, 163 F.App'x 658, 664 (10th Cir. 2006) (finding that 19 minutes was not an unreasonable amount of time to complete a traffic stop where the officer needed to complete background checks on two individuals and there was no evidence in the record that the officer was stalling in the performance of his routine tasks); *see also United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005).

11.    **Continued Detention**. Defendant Sauzameda-Mendoza next asserts that Officer Alvarez failed to establish any reasonable suspicion that he was engaged in illegal activity and that the Defendant's continued detention was therefore unlawful.

12.    Without reasonable suspicion of criminal activity, a traffic stop may not be unjustifiably

prolonged beyond the time reasonably necessary to issue a citation. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Lyons*, 510 F.3d at 1237. Further detention is proper only if, during the course of the stop, "(1) the officer develops an 'objectively reasonable and articulable suspicion' that the driver is engaged in some illegal activity, or (2) 'the initial detention . . . become[s] a consensual encounter.' " *Rosborough*, 366 F.3d at 1148 (citing *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir.1996)). The United States contends that both of these exceptions are present in the instant case.

13.   *Reasonable Suspicion.* A traffic stop may be expanded beyond its initial purpose if, during the course of the stop, "the detaining officer acquires reasonable suspicion of criminal activity." *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009). Reasonableness "depends on a balance between the public interests and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (internal quotation omitted); *see also United States v. Cheromiah*, 455 F.3d 1216, 1221 (10th Cir. 2006). This inquiry requires the Court to "look at the totality of the circumstances of each case to see whether the detaining officer [had] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1269 (10th Cir. 2003) (internal quotations omitted). In determining whether this standard was met, courts "accord[] appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Clarkson*, 551 F.3d at 1201.

14.   At the time Officer Alvarez detained Defendant, he was aware of the following factors contributing to a finding of reasonable suspicion: (1) the Defendant's travel route was a

well-known drug trafficking corridor that circumvents a United States Border Patrol

Checkpoint on Hwy. 80W between Douglas and Benson; (2) the Defendant and driver

were off course because they were taking a route from Douglas to Benson that added

approximately 90 minutes of driving time to the more direct route of Hwy. 80W; (3) Mr.

Alcuras's explanation regarding his travel route, i.e., that he was not from the area and

got lost, was inconsistent with the fact that he had an Arizona Driver's License with a

Douglas, Arizona address that had been issued roughly four weeks prior to the stop; (4)

the men were stopped less than 100 miles from the U.S./Mexico border; and (5) neither

Mr. Alcuras nor Defendant Sauzameda-Mendoza were sure of the name of the person to

whom they intended to return the boat, even though both subjects said that they were

returning the boat to Defendant's "friend."  Considering the totality of the circumstances,

the Court concludes there was reasonable suspicion to justify a brief investigatory

detention beyond the initial traffic stop.

15.    Similar factors have been cited by the Tenth and other circuits as consistent with a

finding of reasonable suspicion or probable cause. *See, e.g.*, *United States v.*

*Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (proximity to border and driver's behavior);

*United States v. White*, 584 F.3d 935, 950–51 (10th Cir. 2009) (nervousness and

implausible travel plans); *Cheromiah*, 455 F.3d at 1221–22 (characteristics of the area in

which the vehicle is encountered, proximity of the area to the border, and usual patterns

of traffic on a particular road); *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th

Cir. 2004) (circuitous and impractical travel route); *United States. v. Santos*, 403 F.3d

1120, 1131 (10th Cir. 2005) (a defendant's "vague, evasive, and inconsistent" answers to

an officer's questioning may contribute to reasonable suspicion).

16.    The Court concludes that these same factors contributed to a finding of reasonable

suspicion in the case at hand.  In developing reasonable suspicion, officers are permitted

"to draw on their own experience and specialized training to make inferences from and

deductions about the cumulative information available to them that might well elude an

untrained person." *United States v. Guerrero*, 472 F.3d 784, 797 (10th Cir. 2007)

(quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations and quotations

omitted)).  Thus, the determination whether reasonable suspicion is present "is made from

the perspective of the reasonable officer, not the reasonable person," *id.*, and an officer

"is entitled to assess the facts in light of his experience."  *Brignoni-Ponce*, 422 U.S. at

885.

17.    Here, Officer Alvarez was an experienced officer who, on previous occasions, had

spoken directly with drug smugglers who had experience transporting narcotics from

Douglas, AZ, east to I-10 and then west on I-10 to Benson.  In those conversations, he

learned that smugglers use this route to avoid Border Patrol checkpoints. Officer Alvarez

was familiar with the area and the high incidence of drug-smuggling activities that took

place on this particular stretch of highway due to its remoteness, close proximity to the

U.S.-Mexico border, and lack of Border Patrol checkpoints.  Thus, the fact that the

Defendant was traveling on this particular road to Benson – which added approximately

90 minutes to the more direct route of travel – and was stopped within 100 miles of the

U.S./Mexico border, reasonably aroused Officer Alvarez's suspicions.  Further, Mr.

Alcuras's explanation that he was not from the area and had missed his turn, despite his

having a Douglas, Arizona address listed on his driver's license, justifiably compounded Officer Alvarez's concerns. Finally, while the fact that neither man was certain of the name of the person to whom they were taking boat would not independently support a finding a reasonable suspicion, the Court concludes that the sum of these factors provided a basis for reasonable suspicion.

18.    Finally, in order for an investigatory detention to be reasonable, it must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). In addition, the "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* The Tenth Circuit has recognized that "there is no absolute rule for determining how long an investigative detention may continue before it becomes unreasonable under the Fourth Amendment. Rather, the length of the stop and the potential intrusion on an individual's Fourth Amendment rights must be juxtaposed against the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 1994) (citations omitted).

19.    In this case, Officer Alvarez concluded the initial traffic stop at 9:59 a.m. by returning Mr. Alcuras's license and registration and issuing the appropriate citations. During the next 14 minutes, Officer Alvarez conducted *Terry* patdowns and asked both men, independently, several additional questions. From about 10:13 a.m. to 10:15 a.m., Officer Alvarez and his narcotics detection canine "Bodo" circled the truck and boat, and Bodo alerted to the presence of narcotics. Given this timeline, the Court concludes that

Officer Alvarez worked diligently to confirm or dispel his suspicions that the subjects

were hauling illegal drugs.  Furthermore, as Defendant himself notes, "the use of a drug

sniffing dog during a traffic stop does not require reasonable suspicion as long as the

traffic stop is not unreasonably extended."  (Doc. 35 at 5) (citing *Illinois v. Caballes*, 543

U.S. 405 (2005)).  Employing Bodo took only minutes and did not unreasonably prolong

the stop.  Officer Alvarez's questions and use of a drug detection canine were valid, non-

intrusive means of confirming or dispelling his suspicions.  Thus, the Court concludes

that the investigative detention was supported by reasonable suspicion and was

reasonable in both scope and duration.

20.  *Consensual Encounter.*  The Government contends that although Officer Alvarez's

reasonable suspicion was sufficient to establish the lawfulness of Defendant's continued

detention, the constitutionality of the stop was also supported by the fact that Officer

Alvarez converted the *Terry* stop into a consensual encounter.  Because the Court finds

that the investigative detention was supported by reasonable suspicion, it need not

address whether the encounter was consensual.

21.  **Consent to Search**.  Defendant Sauzameda-Mendoza next asserts that he initially did *not*

consent to the search of the vehicle, and that his later decision to consent was an

involuntary response to Officer Alvarez's coercive statement that he was seeking a search

warrant.

22.  Search of a vehicle is constitutionally permissible if the owner of the vehicle voluntarily

consents to the search.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne

of the specifically established exceptions to the requirements of both a warrant and

probable cause is a search that is conducted pursuant to consent.")  When the validity of a search or seizure is based on consent, the United States bears the burden of showing that the consent "was freely and voluntarily given."  *Florida v. Royer*, 460 U.S. 491, 497 (1983).

23.    Defendant asserts that Officer Alvarez's statement that he would obtain a warrant if Defendant did not consent was "subtly coercive," and should render Defendant's subsequent consent void.  The Supreme Court has held that consent given solely upon an official's representation that he possesses a warrant is invalid. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).  It is less clear, however, whether an officer's representation that he *will get* a warrant likewise vitiates a subject's consent.   In *United States v. Stallings*, 810 F.2d 973, 976 (10th Cir. 1987), the Tenth Circuit held that a defendant gave valid consent where law enforcement officials stated they would *attempt* to obtain a warrant if consent was not given.  Here, however, when Defendant asked him whether, if he did not give consent, Officer Alvarez would obtain a warrant anyway, Officer Alvarez replied "yes."  Thus, the Court is presented with a situation where Defendant at least arguably gave his consent based on an understanding that issuance of a search warrant – though not yet completed – was inevitable.

24.    Courts facing similar scenarios have generally upheld the validity of consent where an officer's representation that he could obtain a warrant was "genuine . . . and not merely a pretext to induce submission."  *United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994); *United States v. Watson,* 117 F.3d 1421, 1997 WL 377035, * 3 (6th Cir.) (unpublished disposition), *cert. denied,* 522 U.S. 961, 118 S.Ct. 393 (1997) ("Notifying a

person that a warrant can be obtained does not render consent involuntary unless the threat to obtain the warrant is baseless."); *United States v. Kaplan,* 895 F.2d 618, 622 (9th Cir. 1990) (noting the distinction between an officer stating that "he will *attempt* to obtain a search warrant . . . [versus] say[ing] he *can obtain* the search warrant, as if it were a foregone conclusion," and holding that "consent is not likely to be held invalid where an officer tells a defendant that he could obtain a search warrant if the officer had probable cause upon which a warrant could issue"); *United States v. Hernandez*, 1994 WL 789371, *1-2 (S.D. Tex. May 14, 1994) (finding that a defendant's consent was voluntary despite an officer's statement that if the defendant did not consent, the agents would obtain a search warrant).

25.    While there may be circumstances in which an officer's representation that he would inevitably secure a search warrant would invalidate a subject's consent, the Court concludes that those circumstances are not present here.  First, Officer Alvarez's statement that he would obtain a search warrant was made after Defendant specifically asked him whether he would "get a warrant anyway."   Second, Officer Alvarez made the statement after the District Attorney's office had approved his request to seek a warrant. Third, Officer Alvarez did in fact have probable cause to search the truck and the boat based on Bodo's alert to the vehicles and the subjects' answers to Officer Alvarez's questions.  Fourth and finally, numerous additional factors cited by the Tenth Circuit as relevant to the validity of consent support the voluntary nature of the exchange.

26.    It is well established that "a drug dog's alert establishes probable cause . . . if that dog is reliable." *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011)*; see also United*

26

*States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009) ("This court has consistently

held that probable cause can be based on alerts by trained dogs.") (citation omitted).  "A

party seeking to suppress evidence found during a search after a positive dog alert bears

the burden of proving that the dog is unqualified." *United States v. Kitchell*, 653 F.3d

1206, 1224 (10th Cir. 2011).  In this case, Defendant Sauzameda-Mendoza failed to offer

any evidence suggesting that Bodo was unqualified.  By contrast, Officer Alvarez

testified that he and Bodo have been certified as a narcotics detection team on four

separate occasions, the last of which was issued in October of 2011 by the New Mexico

Department of Public Safety, Criminal Enforcement Unit.

27.    The subjects' responses to Officer Alvarez's questions provided further evidence to

support probable cause.  For instance, when Officer Alvarez asked Mr. Alcuras how he

knew to take I-10 west to Benson once he realized he was lost, Mr. Alcuras explained

that he looked up directions on his phone at the Arizona/New Mexico border – an area

where, in Officer Alvarez's experience, it is virtually impossible to get cell phone

service.  When Officer Alvarez asked Mr. Alcuras where he got the boat, Mr. Alcuras

explained that he and Defendant picked up the boat "from a friend of ours" in Douglas.

When Officer Alvarez asked Defendant the same question, Defendant said that he picked

up the boat in Puerto Peñasco, Mexico, and that Mr. Alcuras had not been present.

Finally, Mr. Alcuras explained that he and Defendant had taken the boat to go fishing in

San Carlos "last week," whereas Defendant stated that he had not taken the boat

anywhere else after picking it up in Puerto Peñasco.

28.    Having found that Bodo is a certified and reliable narcotics detection canine, the Court

concludes that Bodo's alerts to the truck and the boat as well as the subjects' responses to

Officer Alvarez's questions provided probable cause to initiate a search.  Officer Alvarez

therefore could have obtained a warrant, and his representation to this effect was neither

baseless nor mere pretext.  Accordingly, Officer Alvarez's response that he would obtain

a warrant if Defendant failed to consent did not render Defendant's consent involuntary.

29.     Several additional circumstances also support the voluntary nature of Defendant's

consent.  "[T]he question whether a consent to a search was in fact 'voluntary' or was the

product of duress or coercion, express or implied, is a question of fact to be determined

from the totality of all the circumstances."  The Tenth Circuit has identified a number of

factors courts may consider in determining whether an encounter was voluntary: (1) the

number of officers; (2) language and tone of voice; (3) whether the encounter occurred in

a public place; (4) whether the suspect was advised that he was free to leave; and (5)

whether the suspect's documents or other personal effects were returned.  *See United*

*States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006).  Courts have also pointed to

other factors as evidence that an encounter *was* consensual, such as an officer's

"pleasant" demeanor and a "a tone of voice that is not 'insisting,' a public location such

as 'the shoulder of an interstate highway, in public view,' and the prompt return of the

defendant's identification and papers."  *Id.* (internal citations and quotations omitted).

These factors are not exhaustive, nor is any one factor dispositive.  *United States v.*

*Sandoval*, 29 F.3d 537, 54 (10th Cir. 1994).

30.     In this case, Officer Alvarez used a conversational tone at all times during the encounter

and did not exhibit any show of force; the encounter took place along a busy stretch of I-

28

10, during daylight hours; all of the documents were returned to the driver; Defendant

clearly understood his right to refuse consent because he, in fact, did initially refuse

consent; Defendant was fluent in English and Spanish; and Defendant appeared to fully

understand and appreciate what was happening.  When Defendant specifically asked

Officer Alvarez whether he correctly understood the form to say that he had "the right to

. . . . not give you consent," Officer Alvarez replied "yes."  Finally, although Defendant's

concern regarding the time-consuming nature of the search warrant process may have

placed additional pressure on Defendant to consent, "coercion does not exist merely

because a person has a reason to give consent . . . ."  *United States. v. Watson*, 117 F.3d

1421 (Table) 1997 WL 376954 (6th Cir. 1997).  Thus, under the totality of the

circumstances, the Court finds that Defendant Sauzameda-Mendoza's consent to search

the truck and the boat was knowing, voluntary and intelligent.

31.    **Inevitable Discovery Doctrine**.  The United States argues that the evidence of

Defendant's drug trafficking offense found in his vehicle is admissible under the

inevitable discovery doctrine.  The Court agrees, and concludes that even if Defendant's

consent was invalid, an independent, lawful police investigation inevitably would have

discovered the hidden contraband.

32.    "The inevitable discovery doctrine provides an exception to the exclusionary rule and

permits evidence to be admitted if an independent, lawful police investigation inevitably

would have discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir.

2005) (internal citation and quote marks omitted). "The burden rests on the government

to prove 'by a preponderance of the evidence that the evidence at issue would have been

discovered without the Fourth Amendment violation.'  In regard to roadside car searches,

'[i]f evidence seized unlawfully would have been inevitably discovered in a subsequent

inventory search, such evidence would be admissible.' " *United States v. Martinez*, 512

F.3d 1268, 1273-74 (10th Cir. 2008) (quoting *United States v. Tueller*, 349 F.3d 1239,

1243 (10th Cir. 2003)).

33.    "While the inevitable discovery exception does not apply in situations where the

government's only argument is that it had probable cause for the search, the doctrine may

apply where, in addition to the existence of probable cause, the police had taken steps in

an attempt to obtain a search warrant." *United States v. Souza*, 223 F.3d 1197, 1203

(10th Cir. 2000).  "[W]hat makes a discovery 'inevitable' is not probable cause alone . . .

but probable cause plus a chain of events that would have led to a warrant (or another

justification) independent of the search." *Id.* (citing *United States v. Brown*, 64 F.3d

1083, 1085 (7th Cir.1995)).  "The key issue in these cases, one of probability, is how

likely it is that a warrant would have been issued and that the evidence would have been

found pursuant to the warrant." *Id.* at 1204.  The Tenth Circuit has held the following

factors to be useful in the determination whether issuance of a warrant and discovery of

the evidence was probable: (1) the extent to which the warrant process has been

completed at the time those seeking the warrant learn of the search; (2) the strength of the

showing of probable cause at the time the search occurred; (3) whether a warrant

ultimately was obtained, albeit after the illegal search; and (4) evidence that law

enforcement agents "jumped the gun" because they lacked confidence in their showing of

probable cause and wanted to force the issue by creating a fait accompli. *Id.* (citing

*United States v. Cabassa*, 62 F.3d 470 (2d Cir.1995)).  "The extent to which the warrant process has been completed at the time those seeking the warrant learn of the search, and whether a warrant is ultimately obtained, are factors entitled to great importance in determining whether the evidence would have inevitably been discovered pursuant to a warrant." *Id.*

34.     In this case, the probability is very high that the evidence would have been discovered pursuant to a search warrant.  First, at the time the search occurred, Officer Alvarez had already taken steps to secure a warrant by contacting the District Attorney's office, detailing his probable cause to search, and obtaining approval to seek a warrant.  Second, at the time of the search, probable cause to believe that the truck or the boat contained contraband was very strong.  In addition to the subjects' suspicious responses to several of Officer Alvarez's questions, Officer Alvarez's canine Bodo had alerted to the presence of narcotics in both the truck and the boat.  Third, although there is no evidence that a warrant eventually issued, neither is there evidence that a Magistrate Judge refused approval for a warrant.  Assuming a search warrant did not issue, it is more likely that Officer Alvarez did not continue to pursue the warrant application upon his belief that he had received valid consent.  Finally, there is no indication that Officer Alvarez jumped the gun because he lacked confidence in his showing of probable cause.  By contrast, he had received approval to seek a warrant and had a high level of confidence in his probable cause to search.  He initiated the search in reliance on Defendant's appearance of consent. Thus, the Court concludes that regardless of the validity of Defendant's consent, Officer Alvarez would have obtained a warrant and the evidence would have

31

been discovered. *See id.* at 1206 ("Although we are very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convinces us that this is one of those occasions when the doctrine should apply.")[9]

35.   **Post-Miranda Statement**. Although Defendant failed to specifically brief this issue, his Motion to Suppress asks the Court to suppress any "evidence and statements allegedly made by Defendant after his unlawful detention and interrogation," which the Court interprets to include his post-arrest statements made to SA Prieto at the ICE office in Deming, New Mexico.

36.   At the evidentiary hearing, defense counsel questioned SA Prieto regarding the time of day these warnings were given and asked whether Defendant Sauzameda-Mendoza had been advised of his rights at any point prior to this interview. SA Prieto stated that he did not believe Defendant had been advised of his rights prior to their interview. While this

---

[9] Furthermore, under the "automobile exception" to the warrant requirement, law enforcement officers "who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *United States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir. 2004) (quoting *Florida v. Meyers*, 466 U.S. 380, 381 (1984)); *California v. Carney*, 471 U.S. 386, 390 (1985) ("[T]he guaranty of freedom from unreasonable searches and seizures . . . recogniz[es] a necessary difference between a search of a store, dwelling house or other structure . . . and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.") Thus, because Officer Alvarez had probable cause to search, the inevitable discovery doctrine may also be applicable to this case via the automobile exception to the warrant requirement.

could be problematic if the Government intended to introduce any of Defendant's
statements made prior to being advised of his *Miranda* rights as evidence against him,
there is no indication that this is the case.  Neither the Defendant nor the Government has
suggested that Defendant made any incriminating statements to law enforcement officers
prior to his interview with SA Prieto.

37.     In regard to statements made during the interview itself, the Court concludes that
Defendant was well advised of his rights and made a knowing, intelligent, and voluntary
waiver of these rights.  *See United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010)
("A waiver of Miranda rights must be made voluntarily, knowingly, and intelligently.").
In the Tenth Circuit, the inquiry into the validity of a waiver has two "dimensions":

First, the relinquishment of the right must have been voluntary in the sense that
it was the product of a free and deliberate choice rather than intimidation,
coercion, or deception. Second, the waiver must have been made with a full
awareness of both the nature of the right being abandoned and the consequences
of the decision to abandon it. Only if the totality of the circumstances surrounding
the interrogation reveal both an uncoerced choice and the requisite level of
comprehension may a court properly conclude that the Miranda rights have been
waived.

*Id.* (quoting *Smith v. Mullin*, 379 F.3d 919, 932 (10th Cir.2004)).

38.     In analyzing whether a defendant's rights were voluntarily waived, courts consider "the
suspect's age, intelligence, and education; whether the suspect was informed of his or her
rights; the length and nature of the suspect's detention and interrogation; and the use or
threat of physical force against the suspect."  *Id.*

39.     In this case, Defendant was an adult man who appeared to fully comprehend his
circumstances.   He initialed beside each individual right contained on the Statement of
Rights form and signed the waiver of these rights.  He never indicated that he did not

33

understand these rights nor did he express any reluctance in signing the waiver. He never requested an attorney. Further, there is no evidence of coercion. SA Prieto and SA Martos interviewed Defendant for a period of only a few minutes, were wearing plain clothes, and never threatened nor brandished any weapon in Defendant Sauzameda-Mendoza's presence. The tone of the interview was conversational and Defendant never requested to terminate the interview. Under the totality of the circumstances, the Court concludes that Defendant's waiver of his *Miranda* rights was knowing, voluntary and intelligent, and insofar as Defendant requests suppression of these statements based on an invalid waiver his motion is denied.

40.    For the foregoing reasons, Defendant's Motion to Suppress Evidence and Statements is denied in its entirety.


**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence and Statements and Supporting Memorandum (doc. 35) is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**